# United States Court of Appeals
## For the First Circuit

No. 13-1511

ROBERT ADAMSON,

Plaintiff, Appellant,

v.

WALGREENS CO.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Stahl, and Lipez,
Circuit Judges.

Paul J. Caruso, with whom John Martin and Mann Martin LLP were on brief, for appellant.
Gregory A. Manousos, with whom Laura E. Ogden and Morgan, Brown & Joy, LLP were on brief, for appellee.

April 29, 2014

**STAHL, <u>Circuit Judge</u>**.  Plaintiff-Appellant Robert Adamson was terminated from his position as an assistant manager for Defendant-Appellee the Walgreen Co. ("Walgreens") after two instances of failing to provide what Walgreens considered adequate customer service.  Adamson appeals from the district court's grant of summary judgment to Walgreens on his state and federal age discrimination claims.  We affirm.

## I.  Facts & Background

Because this appeal is from the entry of summary judgment in favor of Walgreens, we recite the facts in the light most favorable to Adamson and draw all reasonably supported inferences in his favor.  <u>Faiola</u> v. <u>APCO Graphics, Inc.</u>, 629 F.3d 43, 45 (1st Cir. 2010).  However, "evidence from the moving party as to specific facts can be accepted by the court where no contrary evidence is tendered by the party opposing summary judgment."  <u>Statchen</u> v. <u>Palmer</u>, 623 F.3d 15, 18 (1st Cir. 2010) (emphasis omitted).

Adamson began his tenure with Walgreens in September 2007, when he was hired to work as an assistant manager in one of its Florida stores.  Among other duties, assistant managers are responsible for the "protection of store assets" and providing "proper service to all customers."  Adamson was fifty-five years old when hired.  Just over a year later, he requested and received a transfer to Massachusetts, working first in Chicopee and later in

-2-

Worcester.  In October 2010, he was transferred to the Walgreens store in Ware, Massachusetts, where his supervisor was Stephen Benoit.  Adamson was fifty-eight years old at that time.

On October 21, 2010, a customer entered the Ware store and attempted to make a return.  The cashier called for managerial assistance via intercom, but Adamson, who was the manager on duty, did not respond.  At that time, he was taking in a delivery in the stockroom at the back of the store.  The cashier sought Adamson out in the stockroom and asked for his assistance with the return.  Adamson asked the cashier to tell the customer that he would take the return later.[1]  By the time Adamson left the stockroom to process the return, the customer had already left the store.  Benoit testified during deposition that this incident prompted a complaint from the customer, which the cashier subsequently relayed to Benoit.

Before determining whether or how to discipline Adamson for this incident, Benoit contacted Peter Serafin.  Serafin is a Walgreens Loss Prevention Supervisor, and Benoit sought his input due to his knowledge of disciplinary issues involving other Walgreens employees in the region.  After consulting with Serafin, Benoit issued Adamson a "Final Written Warning," listing as the basis for the discipline "Poor Customer Service/refused customer

_____

[1] There is a dispute as to exactly what Adamson instructed the cashier, but all parties agree that he asked that the customer be told that he could not process the return immediately.

-3-

return."  When given the option to offer a written response, Adamson acknowledged that he had made a bad judgment call and stated that he would "continue to maintain [his] high standards of customer service throughout while exercising better judgement [sic]."

On February 5, 2011, Adamson opened the Ware store alone because the other employee scheduled that morning had not arrived. When he could not find the employee's telephone number at the front of the store, he went to the back office to look for the employee telephone list.  He did not locate the list, and, still in the back office, made two telephone calls to other colleagues in an attempt to determine the missing employee's number.  He eventually obtained the number and called the clerk from a cosmetics counter in the front of the store.  Adamson admits that he was in the back office with the door closed for approximately two to three minutes.

That same day, a customer called a Walgreens customer hotline to complain that she had been in the Ware store that morning and was unable to make a purchase because the register was unattended.  A written record of the call indicates that she reported that she called out for an employee but nobody came and that she waited at the register for fifteen minutes.  However, a surveillance video shows that she was actually in the store for just over two minutes and waited at the register for approximately twenty seconds.  The video shows the customer placing items at the

register, looking up and down the aisles, and then leaving without making a purchase. Adamson does not appear in the video -- which covers the front of the store -- for a stretch of approximately twelve minutes, eventually appearing about thirty seconds after the customer left. Adamson admits that the video does not show him for a twelve-minute period, but states that, aside from the two to three minutes he was in the back office, he was working in aisles in the back part of the store. He states that he was in the aisles, and not in the back office, at the time that the video shows the complainant in the store, but says he never saw the complainant or heard anyone calling out for an employee.

The written record of the complaint was passed along to Benoit for investigation. A Walgreens policy required him to follow up with the complainant within two days. Benoit's attempts to contact her in that time frame were unsuccessful, so he submitted information to Walgreens indicating that he had not contacted her. In his deposition, Benoit testified that he was later able to reach the complainant, that they discussed the February 5 incident, and that she indicated that she was not seeking a monetary settlement and simply wanted to advise the company of what had happened. He also testified that he contacted Serafin and Paul Holstein (then forty-six), the district manager, for "fairness and consistency" purposes and to discuss their interpretation of Walgreens' policies, procedures, and guidelines.

Benoit also viewed the video footage from that morning, although the parties dispute when he did so.

On February 10, Walgreens terminated Adamson's employment. The termination notice states in part: "In reviewing the video, [c]onfirmed that the main [cashier] was not present and you were not present as well." It lists "Poor Customer Service" as the basis of the discipline, noting that Adamson "[s]hould have managed the store from the front entrance [until] support arrived. . . . Mr. Adamson fail[ed] to do so and left the front store[,] opening it up to possible theft and poor customer service."

After Adamson was terminated, an existing employee, then fifty years old, was transferred into his position. A few weeks later, this employee suffered an on-the-job injury and began a leave of absence, and another existing employee, then thirty-seven years old, was transferred into the position.

Adamson filed suit in federal court, alleging that he was terminated because of his age in violation of both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and Massachusetts General Laws chapter 151B, § 4(1B). The district court granted summary judgment in favor of Walgreens. Adamson appeals.

-6-

## II.  Analysis

We review a grant of summary judgment de novo, reversing the district court "only if, after reviewing the facts and making all inferences in favor of the non-moving party . . . , the evidence on record is sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Prescott v. Higgins, 538 F.3d 32, 39-40 (1st Cir. 2008) (internal quotation marks omitted).  We draw all reasonable inferences in Adamson's favor, but we are "not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the [c]ourt by a party." Torrech-Hernández v. Gen. Electric Co., 519 F.3d 41, 47 (1st Cir. 2008).

The ADEA makes it unlawful for an employer to discharge an employee because of that employee's age.  29 U.S.C. § 623(a)(1). The employee bears the burden of proving that age was the but-for cause of his termination.  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009).  "Where, as here, the employee lacks direct evidence, we utilize the burden-shifting framework developed by the Supreme Court to facilitate the process of proving discrimination." Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 123 (1st Cir. 2011) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)).

The first step of this framework requires the employee to establish his prima facie case by producing evidence that shows: "(1) that he was at least forty years old when he was fired; (2) that his job performance met the employer's legitimate expectations; (3) that he suffered an adverse employment action such as a firing; and (4) that the employer filled the position, thereby showing a continuing need for the services that he had been rendering." Meléndez v. Autogermana, Inc., 622 F.3d 46, 50 (1st Cir. 2010). Doing so gives rise to a rebuttable presumption of discrimination and shifts the burden of production -- but not persuasion -- "to the employer to articulate a legitimate, non-discriminatory reason for its decisions." Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 447 (1st Cir. 2009) (internal quotation marks omitted). If the employer meets this burden, "the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (internal quotation mark omitted). At the summary judgment stage, the plaintiff need not prove his case, but must proffer sufficient evidence to raise a genuine issue of material fact as to whether he was fired because of his age. See Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000).

After noting that the parties agreed that Adamson had made out the first, third, and fourth factors of his prima facie case, the district court assumed that Adamson had made out the second, and we follow suit. See Gómez-González, 626 F.3d at 662 (finding it "expeditious and appropriate" to assume prima facie case was made where primary focus of dispute was whether proffered reasons for termination were pretextual). We also agree with the district court that Walgreens articulated a legitimate, non-discriminatory reason for terminating Adamson; namely, the two incidents of what it perceived as inadequate customer service. The parties do not appear to dispute either of these points on appeal.

Instead, the parties focus on the final stage of the burden-shifting analysis: whether Adamson presented sufficient evidence to create a genuine issue of material fact as to whether the proffered reason for his termination was pretextual and that the "the pretextual reason[] [was] 'intended to cover up the employer's real motive: age discrimination.'" Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 143 (1st Cir. 2012) (quoting Mesnick v. Gen. Electric Co., 950 F.2d 816, 824 (1st Cir. 1991)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted

-9-

non-discriminatory reasons." Gómez-González, 626 F.3d at 662-63 (internal quotation marks omitted).

Before the district court, Adamson advanced four claims in attempting to meet his burden of showing both pretext and discriminatory intent: (1) the reason proffered for his termination was false; (2) Walgreens violated company policies to facilitate his termination; (3) younger peers were treated better than he was in terms of scheduling and responsibilities; and (4) younger peers were disciplined less harshly for more severe behavior. The district court held that these claims, to the extent they found any evidentiary support in the record, were insufficient to create a genuine issue of material fact. Adamson argues that, in reaching this conclusion, the district court impermissibly resolved disputed facts, a task properly left to the fact-finder.

Adamson first argues that the district court impermissibly resolved disputed issues as to Benoit's credibility when rejecting Adamson's claim that the reason proffered for his termination was false. In essence, Adamson suggests that there is a genuine issue as to whether Benoit himself believed that the reason given for his termination was actually true. "In assessing pretext, a court's 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." Mesnick, 950 F.2d at 824 (quoting Gray v. New Eng. Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)).

Adamson's argument centers on discrepancies regarding how long the February 5 complainant waited at the register. The written record of the complaint states that the complainant reported having waited fifteen minutes at the counter, while the video shows that she was in the store for just over two minutes and waited at the register for approximately twenty seconds. In his deposition, Benoit stated that his investigation showed that the complainant was in the store for fifteen minutes but that he could not remember how long she was at the register.[2] After conferring with counsel, he later said that he did not know how long she was in the store, and that it may have been only five minutes.

As the district court noted, it would not be surprising if Benoit misremembered events that had happened more than two years earlier and recited the timing reported by the complainant rather than the correct timing as shown by the video. Regardless, the district court did not determine whether Benoit was credible regarding the duration of the complainant's wait; it simply (and correctly) noted that the undisputed facts showed that Adamson left the register unattended long enough for a customer to be unable to make a purchase. There is no evidence to suggest that the length of time she waited played any role in the decision to terminate

---

[2] He first stated that her report that she was at the register for fifteen minutes was "[a]ccurate." However, in response to the next question ("She was at the register for 15 minutes?"), he clarified that she was in the store for fifteen minutes.

-11-

him.  Adamson states that Benoit "reported to his superiors that he reviewed [the] video and [the] customer was at the counter for fifteen minutes."  He points to no evidentiary support for this claim, and we have found none.  And, contrary to Adamson's assertion on appeal, the termination notice does not even mention the duration of the complainant's wait, let alone indicate that the duration was relevant to Walgreens' ultimate decision.[3]  Because nothing in the record suggests that the length of the complainant's wait was material, the district court did not have occasion to, and did not, render any determination as to Benoit's credibility on this issue.[4]  See Bonefont-Igaravidez, 659 F.3d at 124-25 ("Even

---

[3] The notice states, in part, that the "[c]ustomer informed the company that the front store had no employees working.  Due to this, she was unable to make a purchase."

[4] Adamson also asserts that Benoit "admitted to lying . . . about the Adamson incident in order to facilitate the firing of Mr. Adamson" and "admitted to . . . falsifying documents."  As Walgreens has pointed out both before the district court and here, these assertions misconstrue Benoit's deposition testimony.  As stated on the internal "Issue Communication Form," Benoit was required to resolve the complaint within two business days.  He testified that his attempts to contact the complainant within that time period were unsuccessful, so he made a notation on the form that the "contact attempt failed."  When asked why he had made that notation, he repeated the two-day requirement and stated that he "didn't want to lie and say that I contacted the customer when I really didn't at that time."  He stated that he was eventually able to reach the complainant, but did not go back and update the form.  Benoit testified that his notation was truthful at the time made, and Adamson presents no argument or evidence that Benoit was required to subsequently update the form after the two-day window had passed.  We do not understand how this testimony could lend credence to Adamson's assertion that Benoit admitted that he had lied or falsified documents.

assuming, arguendo, that the inconsistencies identified by [the plaintiff] find support in the record, they are still insufficient to demonstrate pretext absent some cognizable nexus to [the defendant's] offered basis for termination. To impugn the veracity of a tangential aspect of [the defendant's] story is not enough.") (footnote omitted). Adamson has not raised any genuine issue as to whether Walgreens believed the truth of its stated reason for terminating him.

Adamson next claims that the district court improperly resolved disputed issues as to Walgreens' violations of its disciplinary policy.[5] It is true that "pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices," Acevedo-Parrilla, 696 F.3d at 142 (internal quotation marks omitted), but Adamson has not made that showing here. He recites some unexceptional passages from

_____

[5] In fact, the district court did not resolve any factual disputes as to whether Walgreens followed its policies, finding the entire subject to fall within the coverage of the business judgment rule. See Adamson v. Walgreens Co., No. 12-30068-RGS, 2013 WL 1456315, at *5 (D. Mass. Apr. 10, 2013). Some of Adamson's arguments are requests that "the court . . . second-guess Walgreens' decision to fire [him] for two instances of poor customer service," id., an endeavor, as the district court properly noted, that is not the province of the court, see Mesnick, 950 F.2d at 825 ("Courts may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions."). However, we do not believe that all of his arguments can be so characterized. The rule that deviations from policy can be evidence of pretext would be meaningless if such deviations were automatically deemed to be business judgments immune from the court's scrutiny.

Walgreens' constructive discipline policy -- rules should be clearly communicated to employees; employees cannot be expected to comply with rules that have not been communicated to them; rules must be enforced in a fair and consistent way -- but relies on a distorted version of the facts in an attempt to show that these policies were not followed.

He first says that the rule communicated to him in the final written warning was that he was required to take customer returns in a timely fashion, and thus he could be subject to enhanced discipline only if he again failed to do exactly that. But the warning communicated more than that. It listed as the basis of discipline "Poor Customer Service/refused customer return," and, when explaining the reason for the discipline, stated, "[c]ustomer service is a great part of our job, not being helpful to any customer, no matter what the issue[,] is just poor customer service." Thus, the evidence shows that he was given clear notice that failure to help a customer was not acceptable, regardless of whether the customer was trying to return merchandise, purchase merchandise, or something else altogether.

Adamson also argues that no clear rule was ever communicated to him regarding how he should handle opening the store when alone, but this is irrelevant. He was clearly informed of his responsibility to attend to customers "no matter what the

issue"; Walgreens did not need to provide him with an additional rule saying "even when you open the store alone."

In arguing that Walgreens violated its policy to uniformly enforce its rules, Adamson presents several examples of younger managerial employees who engaged in misconduct that he characterizes as more severe than his own but who were subject only to final written warnings, while he was subject to termination. "An employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus." Vélez, 585 F.3d at 451 (citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 (1976)). However, the evidence Adamson offers does not suggest discrimination and actually shows that Walgreens treated them all alike. Adamson and every supposed comparator received the same discipline for their first offense -- a final written warning. It was only when he had a second customer service incident, not even four months later, that he received the more severe discipline of termination.[6] He has not provided any example of a younger

_____

[6] Adamson also states that Benoit admitted that no other employee was disciplined for customer service issues "despite the fact that customers had complained about other employees." The record does not support this claim. Benoit did not say that customers complained about other employees; he stated that he "get[s] various complaints on [sic] various different reasons." Nothing in the record establishes that those complaints were about employees as opposed to, for example, product availability or prices. Moreover, Benoit averred in a declaration that, "[b]esides those involving [Adamson], I did not receive any verbal or written customer complaints about any customer service issues involving a

-15-

employee who had a second incident of misconduct after having already received a final written warning. Because his second infraction renders him materially different from these other employees, his attempt to show disparate treatment necessarily fails. See id. ("[I]n order to be probative of discriminatory animus, a claim of disparate treatment 'must rest on proof that the proposed analogue is similarly situated in material respects.'" (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 752 (1st Cir. 1996))). Adamson argues that the district court erred in considering the second incident in determining that these other employees were not similarly situated to him, but this is nonsensical. While he admits that the second incident occurred, he wants it to be ignored, arguing that he was treated differently than other employees who only received Final Written Warnings after one incident. This argument fails because Adamson was fired after two incidents, and there is no basis for the court to ignore that distinction.

Finally, Adamson contends that Walgreens violated its own policies in failing to give him a chance to explain himself and to conduct further investigation once Adamson said that the customer complaint was untrue. However, the policy that he points to is the policy for "Counseling (Verbal Warning)," the first, lowest level of the constructive discipline policy. While it may be good

managerial employee in 2010 or 2011.

-16-

practice to allow employees to justify their conduct before discipline is imposed, nothing in Walgreens' policies required Benoit to do so when issuing his termination notice. See Rivera-Aponte v. Restaurant Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003) (rejecting argument that failure to give plaintiff an opportunity to explain his side showed pretext because "[w]hether a termination decision was wise or done in haste is irrelevant, so long as the decision was not made with discriminatory animus" (citing Gray, 792 F.2d at 255)).

In sum, Adamson has failed to provide any evidence that would raise a triable issue with respect to whether Walgreens violated its own policies and practices -- much less whether such violations establish pretext.

Finally, Adamson argues that the district court erred in resolving disputes regarding alleged preferential treatment given to two younger managerial employees. He states that Benoit gave favorable schedules to younger employees and provided training and promotional opportunities to a younger employee, Julie Martineau, that were denied to him.[7]

As to the first claim, Adamson testified in his deposition that he was required to work six to nine consecutive days, while the younger employees only had to work three to five

---

[7] Adamson also reprises his claim that he was disciplined more severely than similarly situated younger employees. We need not re-address it here.

consecutive days, before getting a day off.  The district court rightly determined that the record evidence was to the contrary. Walgreens provided a chart comparing the three employees' schedules that shows that they each sometimes worked eight, nine, or, in the case of one of the younger employees, even ten straight days before having a day off.  Although he stated that he "question[ed] the validity or the accuracy" of this information, he has not produced any evidence to call it into question.[8]

As to the second claim, Walgreens admits that Martineau was identified by multiple people as having promotion potential and, beginning in November or December of 2010, was provided additional mentorship as part of Walgreens' promotion process. Martineau began working at the Ware store several months before Adamson did.  Benoit testified that she did a good job, she knew the store, and that, having worked with her for some time, he was comfortable with and trusted her.  Walgreens' decision to prepare Martineau, but not Adamson, for promotion, without more, does not support an inference of age discrimination, especially in light of the fact that Adamson was disciplined for an admitted customer service incident within weeks of transferring to the Ware store.

---

[8] He also states that he usually only got one day off at a time while the other two employees often got two consecutive days off.  He has cited no record evidence for this assertion, and the schedule provided by Walgreens shows that he was scheduled to have a single day off slightly less frequently than the other employees.

In sum, being mindful "that courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent," Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)), and "viewing the 'aggregate package of proof offered by [Adamson]' and taking all inferences in [his] favor," Domínguez-Cruz, 202 F.3d at 431 (quoting Mesnick, 950 F.2d at 824-25), we conclude that the record is devoid of evidence from which a jury could infer that Walgreens' proffered reason for terminating Adamson was pretext designed to disguise age discrimination. We therefore affirm the district court's grant of summary judgment on Adamson's ADEA claim.

Because the ADEA and ch. 151B, § 4(1B), analyses are "substantially similar" in all relevant respects,[9] see Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007), this conclusion is also fatal to his claim under Massachusetts discrimination law.

---

[9] Massachusetts law deviates from federal law in at least one respect -- the availability of a "mixed motive" theory, see Diaz v. Jiten Hotel Mgmt., Inc., 671 F.3d 78, 82-84 (1st Cir. 2012) -- that is not material here. Adamson relies solely on the federal framework in this appeal.

### III.  Conclusion

For the foregoing reasons, we <u>affirm</u> the district court's order granting summary judgment in favor of Walgreens.  Costs are awarded to appellees.